IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| CYWEE GROUP LTD., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | CIVIL ACTION NO. 6:20-cv-00128 <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff CyWee Group Ltd. ("Plaintiff" or "CyWee") files this Complaint and Jury Demand alleging fraud against Defendant Google LLC ("Defendant" or "Google") as follows:

### I. PARTIES

1. CyWee is a corporation existing under the laws of the British Virgin Islands with a principal place of business at 3F, No.28, Lane 128, Jing Ye 1st Road, Taipei, Taiwan 10462.

2. CyWee is a world-leading technology company that focuses on building products and providing services for consumers and businesses. CyWee has one of the most significant patent portfolios in the industry and is a market leader in its core development areas of motion processing, wireless high definition video delivery, and facial tracking technology. CyWee's patents include U.S. Patent No. 8,441,438 (the "'438 patent") and U.S. Patent No. 8,552,978 (the "'978 patent") (collectively "CyWee's Patents").

3. On information and belief, Defendant Google is a Delaware limited liability company and a wholly owned subsidiary of XXVI Holdings Inc., a Delaware corporation, which is a wholly owned subsidiary of Alphabet Inc., a Delaware corporation and a publicly traded company. Defendant Google, XXVI Holdings Inc., and Alphabet Inc. all maintain a principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google is registered to transact business in the State of Texas under Texas Secretary of State file number 0800735634 and Texas taxpayer identification number 17704935810, and it has an office in the State of Texas at 500 West 2nd Street, Suite 2900, Austin, Texas 78701. Google may be served through its registered agent for service of process in Texas, Corporation Service Company d/b/a CSC—Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

## II. JURISDICTION

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 and this case is between CyWee, a citizen of a foreign state, and Google, a citizen of Delaware and California.[1] *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) ("[T]he citizenship of a LLC is determined by the citizenship of all of its members.").

5. Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this case involves a substantial question of federal

---

[1] Upon information and belief, Google's sole and managing member is XXVI Holdings Inc., which is a citizen of Delaware and California. *See* 28 U.S.C. § 1332(c)(1). Thus, Google is also a citizen of Delaware and California.

patent law. *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323, 1330 n.8 (Fed. Cir. 2008), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013).

6. This Court has specific personal jurisdiction over Google because Google does business in the State of Texas and is believed to have committed a tort in whole or in part within the State of Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. Further, for the reasons discussed below in this Complaint, this suit arises, at least in part, from Google's contacts with the State of Texas. For instance, Google's contacts include, but are not limiting to: (i) directing its fraudulent misrepresentations to Texas, (ii) knowingly and intentionally injecting itself into litigation pending in the State of Texas, and (iii) conspiring with Texas based entities Huawei and ZTE.

7. Furthermore, the Court's exercise of jurisdiction over Google will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirement of due process. Google maintains a significant business presence in the State of Texas, including within this District. *See Our Offices*, Google (2019), https://about.google/intl/en_us/locations/?region=northamerica&office=austin (listing Google's office location in Austin, Texas); Shonda Novak, *Source: Google to Occupy 35-Story Office Tower in Downtown Austin*, Austin American-Statesman (Jan. 31, 2019), https://www.statesman.com/news/20190131/source-google-to-occupy-35-story-office-tower-in-downtown-austin ("[As of August 2018,] Google had more than 800 employees in Austin."). As a massive trillion-dollar company, with a

significant business presence in this District and a facility which it has spent more than $20 million building out, litigating in this District does not impose any significant burden upon Google. Furthermore, Texas has a significant interest in protecting against fraud that is directed to and related to Texas.

### III.   VENUE

8. Venue is proper in this District because Google resides in this District because Google is subject to the Court's personal jurisdiction in this District. 28 U.S.C. §§ 1391(b)(1), 1391(c)(2).

9. In the alternative, to the extent the Court finds venue should be assessed under 28 U.S.C. § 1400(b), venue is also proper in this District because Google maintains a physical regular and established place of business in this District at 500 West 2nd Street, Suite 2900, Austin, Travis County, Texas 78701.

### IV. FACTUAL ALLEGATIONS

#### A.   CYWEE: A SMALL TECHNOLOGY STARTUP

10. The Industrial Technology Research Institute ("ITRI") is a Taiwanese government- and industry-funded research and development center. ITRI is world-leading research institute with over 6,000 researchers, that has the stated purpose of keeping Taiwan's industrial and defense technologies up to date and at the forefront of technology development. Since its founding in 1973, ITRI has been a significant driver of Taiwan's economy, and it has set up and incubated over 280 startup technology companies, some of which are now global leaders in such industries as smart living, healthcare, and sustainable environment.

11. In 2007, CyWee was formed as a small technology startup and spin-off of

ITRI. Its goal was to provide innovative motion-sensing technologies, such as those claimed in the '438 patent and the '978 patent. Dr. Shun-Nan Liu and Chin-Lung Li, two of the inventors of the '438 patent and the '978 patent, came to CyWee from ITRI. The third inventor, Zhou "Joe" Ye joined CyWee from private industry as its President and served as CEO from 2006 to 2016.

12.  CyWee's Patents were the products of years of research by Dr. Liu and his co-inventors. At a high level, CyWee's research and CyWee's Patents focused on motion tracking technology in portable electronic devices, such as smartphones. For instance, the '438 patent and '978 patent are each directed to devices and methods for tracking the motion of a portable electronic device in 3D space and compensating for accumulated errors to map the 3D movements of the device onto a display frame ('438 patent) or transform the 3D movements for a display, such as a 2D display on a computer or handheld device ('978 patent). For example, CyWee's technology allow a modern smartphone to track its orientation, and then seamlessly output that information to the device's screen ('978 patent)—making today's navigation, gaming, and augmented reality applications possible. This technology, which is now integrated into virtually every smartphone, is also ingrained in our everyday lives. The simple act of using Google Maps to provide heading information while navigating from point A to point B is made possible by CyWee's inventions, and cutting-edge mobile games that rely on the tracking of intricate, subtle movements depend upon those inventions. It goes without saying that CyWee's technology is extraordinarily valuable. CyWee was granted the '438 patent and '978 patent for its novel inventions

in this field.

13. CyWee produces and licenses technology, such as its Sensor Fusion Hub solution, which incorporate several elements of technologies disclosed in CyWee's Patents. CyWee, as a small technology startup, however, has struggled to compete against "Big Tech" behemoths like Google who dominate the market and spend billons to stomp out any threat of competition by small startups like CyWee. It is a common story—when true innovators like CyWee create new and game-changing technology, that technology becomes so valuable that it is far cheaper for those with market dominance to simply take it for themselves, rather than paying for it.

### B. GOOGLE: THE TRILLION DOLLAR BEHEMOTH AND BULLY

14. Google's parent holding company Alphabet is one of the largest companies in the world. In the most recent Fortune 500 rankings, Alphabet was ranked number 15 with over $136 billion in revenue. Alphabet's over $30.7 billion in annual profits make it the ***third most profitable company in the United States***. Alphabet has an unfathomable ***market capitalization of over $1 trillion***, making Google/Alphabet one of only a small handful of companies to break the massive trillion-dollar threshold.

15. Google controls over 90 percent of the internet search market. In fact, Google's dominance in the internet search market is so pervasive that Merriam-Webster Dictionary lists the term "google" as a verb meaning "to use the Google search engine to obtain information about (someone or something) on the World Wide Web." Google's reach, however, extends far beyond its flagship search engine. Google hosts a variety of web applications (i.e. Gmail, YouTube. Google Docs, etc.), is one of

the largest providers of cloud data storage, develops operating systems for mobile phones (Android) and computers (Chrome OS), along with a web browser to run on those systems (Chrome), offers its own home internet service (Google Fiber) and mobile phone service (Google Fi), and develops its own branded products ranging from smartphones to laptops to smart-home systems and thermostats to even self-driving cars. Google's reach sets out to control literally all things related to the internet or technology, including content on the internet itself, how that content is delivered, and the devices it is ultimately delivered on.

16. Google uses its dominance across various areas of technology to force consumers into using its other products and to stomp out competition. For instance, Google strongarms smartphone manufacturers seeking to use its Android operating system by forcing them to join a group called the called the Open Handset Alliance ("OHA") in order to obtain access to Google software applications, or "apps". Then Google threatens the smartphone manufacturers with a loss of access to the Google apps if they stray from using the Google services that are embedded in the Android software. Once a device manufacturer has joined the OHA, the manufacturer cannot use a competing, non-Google version of Android without losing access to Google apps.

17. Google also uses its dominant power to manipulate search results for its own personal agenda—effectively censoring the internet and influencing consumer behavior. For instance, a user searching for a stock quote is automatically directed to Google's own Google Finance platform. A user searching for directions is automatically directed to Google Maps.

18. Google also collects massive amounts of data from its users across various platforms—often without their knowledge. For instance, through its Project Nightingale initiative, Google collected tens of millions of patient health care records without the patients' knowledge or consent. Google uses the massive amounts of data it gathers on its users to manipulate the online content that users see, including directed advertising.

19. Google also has the power to use its dominant market force to influence its political and social agenda. For instance, starting in 2013 Google decided to deprioritize search results for companies providing payday loans, and it more recently sought to ban apps offering payday loan services from its Play Store. Instead, Google searches for "payday lending" yields websites and news articles criticizing the industry, rather than returning information on local providers of the service.

20. Google seeks to be in control and sets out to crush any competition. Google's sheer manipulation power and market dominance is reminiscent of the Standard Oil of the early 1900s or the AT&T of the 1980s. Google's size and power allow it to be a "goliath" and a bully to any competitor that dares to stand in its way.

21. In 2011 the Federal Trade Commission opened an investigation into Google's anti-competitive practices and its attempts to monopolize, including manipulating search results to promote its own products. At that time, FTC staff recommended taking action against Google's anti-competitive practices. Google, however, wielded its strong political influence to convince the presidentially appointed commissioners of the Federal Trade Commission to override their own

staff's recommendation and to decline to file any charges against Google. In stark contrast, regulators in the European Union elected to pursue Google for antitrust violations and ultimately fined Google $2.7 billion for its anti-competitive practices.

### C.  GOOGLE'S COZY RELATIONSHIP WITH THE U.S. GOVERNMENT

22. Amidst widespread criticism for its anti-competitive tactics, Google has forged a comfortable relationship with policymakers and regulators in Washington in order to pursue its policy agendas and keep regulators at bay.

23. Google has positioned itself as the United States' top lobbying public company. For instance, according to the Center for Responsive Politics in 2018, Google's parent company Alphabet spent over $21 million on lobbying, more than any other public company that year. In fact, Alphabet outspent the second highest spending public company, AT&T, by over $3 million. During the Obama administration, Google representatives visited the White House more than once a week, on average, easily exceeding over 250 visits—the highest of any public company. Johanna Shelton, Google's Director of Public Policy and chief antitrust counsel, was the individual lobbyist with the most visits to the Obama White House with ***over 128 visits*** in total.

24. Google and its executives also make large donations to election campaigns and PACs. During the 2016 election cycle, Google and its employees made over $9 million in campaign contributions, the fourth largest of any public company. For example, former Google CEO and Executive Chairman Eric Schmidt served as an advisor and major donor to both Barack Obama's and Hillary Clinton's presidential campaigns.

25. Google also furthers its cozy relationship with Washington by providing free in-kind services to campaigns and congressional offices, and it acted as the informal "White House IT desk" during the Obama administration, permitting top government officials to seek assistance from Google behind closed doors. U.S. Chief Technology Officer Todd Park, top Deputy Technology Officer Nicole Wong (a former Google deputy general counsel), and White House Chief of Staff Denis McDonough regularly held closed door meetings with Google personnel. When the Obama administration found itself embroiled in crisis due to the deployment of the Healthcare Marketplace website being plagued by multiple website reliability issues, the White House turned to Mikey Dickerson (a site-reliability engineer with Google who previously worked on the Obama campaign) to lead the Healthcare.gov fix, and it staffed the team with many recruits from Google.

26. Google has developed a "revolving door" relationship with government administration. For example, former U.S. Chief Technology Officer Megan Smith was a vice president at Google before joining the White House. Former Google CEO Eric Schmidt became Chairman of the Department of Defense's Defense Innovation Advisory Board, while remaining a technical advisor for Google, all while Google was bidding to service the $10 billion Joint Enterprise Defense Infrastructure (JEDI) cloud computing contract.

27. Within the sphere of intellectual property, Google led the charge for Congress to enact the most significant policy changes to patent law in nearly half a century through the America Invest Act (AIA). Google played an instrumental role in

the Coalition for Patent Fairness, along with other big tech companies, which spearheaded the AIA. Under the guise of combating "patent trolls," Google lobbied for the legislation, which provided new mechanisms for large tech companies with virtually unlimited financial resources to invalidate patents in order to advance their business goals, to the great detriment of small startups and inventors.

28. To implement Google's vision of patent policy under the AIA, the White House appointed former Google Deputy General Counsel and Head of Patents and Patent Strategy Michelle Lee to serve as Director of the United States Patent and Trademark Office. Under her leadership, Michelle Lee created a "Big Tech" friendly culture at the USPTO and helped forge a patent policy that would allow big tech companies like Google to crush small innovators with valuable patents covering novel inventions.

29. In sum, Google uses its deep pockets and political influence to attempt to stomp out any party that stands in its way—even if it requires resorting to fraudulent means to do so.

### D.   GOOGLE'S PATENT DEATH SQUAD

30. One of the key changes under the AIA was the creation of *inter partes* review ("IPR") proceedings before the Patent Trial and Appeal Board ("PTAB"). IPR proceedings force a patentee to defend their already granted patent twice—both in District Court and before the PTAB.

31. Google's former Head of Patents, Michelle Lee, was placed in charge of implementing the legislative changes enacted by the AIA, including the creation of IPR proceedings, at the USPTO. This included the hiring of several new

Administrative Patent Judges and creating policies relating to IPR proceedings. Indeed, many of the new Administrative Patent Judges that would oversee IPR proceedings came from big tech companies like Google.

32. IPR proceedings are notorious for killing patents. In fact, killing supposedly "weak" patents was the reason big tech companies like Google lobbied for the creation of this proceeding in the first place. The PTAB has stayed true to its mission of annihilating patents, leading it to be commonly referred to as a "patent death squad." Once an IPR proceeding is instituted, the PTAB finds at least one claim of the challenged patent invalid over 80% of the time.

33. Unlike in District Court, an already issued patent is not entitled to any presumption of validity before the PTAB. Therefore, a petitioner in an IPR need only show that a patent claim is invalid by a preponderance of evidence, rather than by the clear and convincing evidence standard used in District Court. Moreover, a single patent may be subject to a barrage of multiple IPR proceedings, causing a patentee to be forced to constantly defend their patent. Many inventors and startups with valuable patents cannot afford to defend their patents.

34. Defending a patent in an IPR proceeding can be prohibitively expensive. On average, a single IPR proceeding when pursued all the way through appeal exceeds $400,000, but in some cases can easily exceed $1 million. When faced with multiple IPR proceedings, a patentee can be forced to spend millions just to defend its already issued patent. Big tech companies like Google can use their massive corporate wealth to outspend and practically bankrupt any small patentees and

inventors like CyWee.

### E. GOOGLE'S FRAUDULENT CONSPIRACY TO INVALIDATE CYWEE'S PATENTS

35. In order to protect against third parties unfairly reaping the benefits of CyWee's innovation and intellectual property without CyWee's permission, CyWee from time to time is forced to file suit to protect its intellectual property rights. On April 22, 2014, CyWee filed its first lawsuit claiming patent infringement relating to the '438 and '978 patents against Apple Inc. That case was settled and dismissed on February 17, 2017. That very same day, CyWee filed a lawsuit claiming patent infringement relating to the '438 and '978 patents against Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung") in the United States District Court for the Eastern District of Texas. Samsung was served with process on February 23, 2017.

36. Thereafter, CyWee filed lawsuits against other manufacturers of devices that ran on the Android operating system. On May 31, 2017, CyWee filed suit for patent infringement against LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics MobileComm U.S.A., Inc. (collectively "LG") in the United States District Court for the Southern District of California. LG Electronics U.S.A., Inc., and LG Electronics MobileComm U.S.A., Inc., were served with process on June 7, 2017, and LG Electronics, Inc. waived service. Shortly thereafter, on June 9, 2017, CyWee filed suit for patent infringement against Huawei Technologies Co, Ltd. and Huawei Device USA, Inc. (collectively "Huawei") in the United States District Court for the Eastern District of Texas. Huawei was served with process on June 14, 2017.

37.     Meanwhile, upon information and belief, sometime between June 2017 and October 2017—even though it had not been named as a defendant in any lawsuit filed by CyWee—Google began to devise a plan to invalidate CyWee's Patents. Specifically, Google sought to pursue an *inter partes* review ("IPR") proceeding before the United States Patent and Trademark Office ("USPTO"). Google started work on this plan before it had been accused of infringing CyWee's Patents. Indeed, Google was not accused of infringing CyWee's Patents until it was actually sued on April 16, 2018, which was six to nine months after it began devising its scheme to invalidate CyWee's Patents.

38.     Around this same time, LG, ZTE, and other Android device manufacturers formed a joint defense group with the purpose of invalidating CyWee's Patents. Upon information and belief, Google was involved with this joint defense group and conspired with other entities to plan to invalidate CyWee's Patents.

39.     On information and belief, Google was motivated to invalidate CyWee's Patents because (with the exception of Apple, which had previously settled with CyWee), all of the named defendants manufacture devices that run Google's Android operating system. And in the lawsuits against Samsung, LG, and Huawei, the Android operating system was a key component of CyWee's claims for patent infringement. Google requires that all Android devices with an accelerometer, gyroscope, and magnetometer provide a "rotation vector" representing the orientation or attitude of a device. *See, e.g.*, Google, Android 10 Compatibility Definition 84 (2019), https://source.android.com/compatibility/10/android-10-cdd.pdf ("If device

implementations include a 3-axis gyroscope, an accelerometer sensor and a magnetometer sensor, they: . . . MUST implement a TYPE_ROTATION_VECTOR composite sensor."); *Sensor Types*, Android (2019), https://source.android.com/devices/sensors/sensor-types#rotation_vector ("A rotation vector sensor reports the orientation of the device relative to the East-North-Up coordinates frame."). This orientation represents the resulting or resultant deviation claimed in CyWee's Patents.

40. Several time bar restrictions exist with respect to filing an IPR petition. In particular, "[a]n *inter partes* review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, ***real party in interest, or privy*** of the petitioner is served with a complaint alleging infringement of the patent." 35 U.S.C. § 315(b) (emphasis added). A petitioner ***must*** disclose any real parties-in-interest when filing an IPR petition. 35 U.S.C. § 312(a)(2); 37 C.F.R. § 42.8(b)(1).

41. LG and Huawei are real parties-in-interest with Google because LG and Huawei have preexisting, established relationships with Google that extend beyond the fact that they manufacture devices that run on the Android operating system. Specifically, LG and Huawei are the original equipment manufacturers of certain smartphones at issue in CyWee's case against Google. More specifically, when CyWee sued Google for infringement, its complaint accused the Google Pixel 2 XL smartphone, which CyWee later discovered is made for Google by LG. Google filed a counterclaim alleging noninfringement by the Google Nexus 6P, which is a

smartphone device made by Huawei for Google.

42. At the latest, Google was required to file any IPR by June 7, 2018—one year after LG, a real party-in-interest with Google, was served with a complaint alleging infringement of CyWee's Patents.

43. Upon information and belief, between about June 2017 and June 2018, Google worked to prepare an IPR petition with the purpose of invalidating CyWee's Patents. Google, however, failed to file its IPR petitions by the June 7, 2018 deadline.

44. Realizing it had missed a critical deadline that would time bar its IPR petitions, Google, upon information and belief, devised a plan to fraudulently cover up its error by illegal means. Specifically, when it filed its IPR petitions on June 14, 2018, Google intentionally misrepresented the identities of the real parties-in-interest by omitting any LG entity from its disclosures of real parties-in-interest. Tellingly, Google did disclose Huawei as a real party-in-interest—but because Huawei was served with CyWee's complaint against it *exactly one year (to the day)* prior to Google's IPR petitions, the disclosure of Huawei would not operate to time bar the IPRs. Disclosure of LG, however, would have resulted in the termination of the IPRs. Google is believed to have actively concealed LG's status as a real party-in-interest in an attempt to use illegal fraudulent means to deceive the USPTO and CyWee in order to misrepresent Google's statutory deadline to file an IPR petition pursuant to 35 U.S.C. § 315(b) and to hide the fact that the IPRs were untimely filed.

45. On January 10, 2019, LG Electronics, Inc. filed a motion to be joined to the Google IPR petition. At that time, LG disclosed what Google had concealed—

namely that Google, LG Electronics, Inc., and LG Electronics U.S.A., Inc.[2] are real parties-in-interest due to LG's preexisting, established relationship with Google.

46. On January 9, 2020, the Patent Trial and Appeal Board issued a final written decision in Google's IPR proceedings which found several claims of CyWee's Patents unpatentable. But for Google's misrepresentation about LG's identity as a real party-in-interest, the PTAB would not have issued this final written decision.

47. As a result of Google's fraudulent misrepresentation, CyWee has suffered injury by being forced to defend IPR petitions that are believed to have been initiated and carried out by fraudulent means. Further, CyWee has been deprived of its property rights as a result of Google's fraudulent misrepresentations because the fraudulent IPR petitions initiated by Google led to final written decisions invalidating claims of CyWee's Patents. Had Google disclosed the truth about its relationship with LG to the USPTO and/or to CyWee, its IPR proceedings against CyWee would have been terminated as time-barred.

## V. COUNT 1: COMMON-LAW FRAUD

48. Google made a false representation. Specifically, Google falsely listed the identities of the real parties-in-interest to the IPR petition filed by Google by omitting any LG entity from its disclosures of real parties-in-interest in its IPR petition.

49. Google's false representation was material. Specifically, concealing the identity of a real party-in-interest allowed Google to fraudulently pursue an IPR proceeding to invalidate CyWee's Patents, thereby depriving CyWee of its property

---

[2] LG also noted that LG Electronics MobileComm U.S.A., Inc merged into and now is a part of LG Electronics U.S.A., Inc. at the time of their filing.

rights by fraudulent means. Furthermore, the false representation was material because it limited CyWee's ability to challenge Google's ability to pursue an IPR petition.

50. Google's false representation regarding the identities of the real parties-in-interest to the IPR petition was directed to CyWee. For instance, Google served a copy of the IPR petition and false disclosures upon CyWee's legal counsel in Texas. Furthermore, Google directed its IPR petition and false disclosures to the Patent Trial and Appeal Board with the intention that the misrepresentations reach CyWee and induce CyWee's reliance. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).

51. Google knew that its representation regarding the identities of the real parties-in-interest to the IPR petition was false. For instance, Google chose to list Huawei as a real party-in-interest to the IPR petition because Huawei manufactured one of Google's accused devices, but it knowingly omitted LG, another entity who manufactured one of Google's accused devices, but would render the IPR petition time barred. Furthermore, Google is believed to have conspired with other entities to knowingly make this false representation and cover up LG's status as a real party-in-interest as part of a conspiracy to invalidate CyWee's Patents.

52. Google intended and CyWee did in fact rely upon Google's false representation. Specifically, Google intended or had reason to expect that CyWee would rely upon its false representation regarding the identities of the real parties-in-interest to the IPR petition, thus allowing Google to circumvent statutory

requirements and seek to invalidate CyWee's Patents. CyWee did in fact rely upon Google's false representation and did not have any reasons to question the identities of the real parties-in-interest until after CyWee conducted its own investigation, despite Google's statutory obligation to identify the identities of the real parties-in-interest in its disclosures to the IPR petition.

53. As a result of Google's false representation, CyWee suffered injury. For instance, CyWee was forced to wrongfully defend itself in the IPR proceeding, that would have been statutorily barred, but for Google's false representation. In the course of the proceeding, CyWee was limited in the discovery it could pursue and its defense strategies were precluded due to CyWee's late discovery that Google had falsely identified the real parties-in-interest in its IPR petitions. Further, the Patent Trial and Appeal Board invalidated the challenged patent claims, thereby allowing Google to deprive CyWee of its property rights through fraudulent means.

## VI. JURY DEMAND

54. Plaintiff CyWee hereby demands a trial by jury for all causes of action.

## VII.   PRAYER FOR RELIEF

55. Plaintiff requests the following relief:

   a. A judgment that Defendant Google has committed fraud;

   b. Actual, general, and special damages within the jurisdictional limits of this Court;

   c. Pre-judgment and post-judgment interest, at the maximum legal rate, on the damages awarded;

   d. Attorneys' fees for pursuing this action;

  e. Costs of suit; and

  f. Such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Dated: February 18, 2020     Respectfully submitted,

            By: /s/ *Michael W. Shore*
              Michael W. Shore (Texas 18294915)
              mshore@shorechan.com
              Alfonso G. Chan (Texas 24012408)
              achan@shorechan.com
              Ari B. Rafilson (Texas 24060456)
              (*pro hac vice* application to be filed)
              arafilson@shorechan.com
              William D. Ellerman (Texas 24007151)
              wellerman@shorechan.com
              Corey M. Lipschutz (Texas 24099303)
              clipschutz@shorechan.com
              SHORE CHAN DEPUMPO LLP
              901 Main Street, Suite 3300
              Dallas, Texas 75202
              Tel: (214) 593-9110
              Fax: (214) 593-9111

            **COUNSEL FOR PLAINTIFF**
            **CYWEE GROUP LTD.**